## SCHERMERHORN v. DE CHAMBRUN.

(Circuit Court of Appeals, Second Circuit. October 16, 1894.)

### No. 136.

1. FRAUD—PARTIES IN PARI DELICTO.

C., who was engaged as agent of certain heirs of one J., in efforts to recover property formerly belonging to J., under an agreement for compensation contingent upon success, made a contract, in 1876, with defendant, a lawyer, for services. C. made the agreed payments, and afterwards paid defendant other sums for further services. During the year 1876, C. made contracts with sundry lawyers and other persons for services and advances, agreeing to pay them out of his share of the J. property, after payment of expenses and counsel fees, making their claims liens upon such share. In August, 1880, C. contracted in writing with defendant to pay him $30,000 in consideration of services rendered, the amount to be a lien upon C.'s share of the J. property. Defendant had rendered and continued to render important services throughout the litigation. After its close, resulting in a comparatively small recovery, C. brought this suit to establish a trust for his benefit in the $30,000 which had been paid to defendant, alleging that the contract of August, 1880, was made upon a secret understanding between C. and defendant

that the $30,000 should be held in trust for C., in order to withdraw that amount from the liens of the contracts made in 1876, by making it appear to be paid as counsel fees.  *Defendant denied the existence of such trust. Held* that, assuming the alleged trust to be proved (as it did not appear to be), it would constitute a fraud upon C.'s creditors under the contracts of 1876, and a means of fraud upon others with whom he might contract, and equity would not aid C. to obtain the fruits of such fraud from his co-conspirator.

2. SAME—ATTORNEY AND CLIENT.

The fact that defendant was a lawyer would not bring the case within the exception as to transfers of property made by a client to his attorney to defeat creditors, since it did not appear that C. was induced to create the alleged trust by defendant's suggestion or advice, and the exception exists only where client and attorney are not in pari delicto, but the former acts under the advice of the latter.

This was a suit by Pierre De Chambrun, as administrator of Charles A. De Chambrun, against George J. Schermerhorn, to establish and enforce a trust, and is now heard on defendant's appeal from a decree of the circuit court in the Southern district of New York, sustaining the bill upon pleadings and proofs, and directing an accounting.  59 Fed. 504.  The suit was originally brought by Charles A. De Chambrun, but after the complainant's proofs had been in part put in, he died, and his administrator was duly substituted.  The words "complainant" or "De Chambrun," wherever used in this opinion, refer, of course, to the original complainant.  Much of the record in this suit was before this court in De Chambrun v. Campbell's Adm'rs, 54 Fed. 231, and reference may be made to the voluminous statement of facts contained in the opinion in that case, much of which is necessarily reproduced here.

Arthur H. Masten and Louis Marshall, for appellant.

Everett P. Wheeler, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge.    Charles, Marquis De Chambrun, was a citizen of France, for some time prior to the transactions hereinafter set forth a resident of this country, and attached to the French legation at Washington as its counsel and legal adviser.    He was by profession a lawyer, though, of course, being an alien, not a practitioner in the courts of this state.    Defendant is a lawyer, admitted to the bar in 1867.    Until 1869 he was employed as a law clerk, the latter part of the time in the office of Edmonds & Field, where he acquired some knowledge as to the Jumel litigation, hereinafter referred to.    Thereafter he entered upon the practice of his profession on his own account, continuing therein until the summer of 1876, when he met the complainant.    For the period from 1870 to July, 1873, however, he was employed otherwise than at the bar.    For many years there was pending in the United States courts what was known as the "Jumel litigation," which involved the title to valuable real estate in the upper part of the city of New York, in the possession of Nelson Chase and others, who derived their title from Madame Jumel, the widow of Stephen Jumel.    This litigation found its way into the supreme court of the United States in the case of Bowen v. Chase, 94 U. S. 812, 98 U.

S. 254.  During the progress of that suit it was discovered that the property involved had at one time belonged to Stephen Jumel, and it was claimed that the title thereto was still vested in his heirs. This claim came to the knowledge of De Chambrun some time in 1875, through one Joseph B. Stewart, a lawyer in New York, and on July 8, 1875, he entered into a contract with Nathaniel Wilson, a lawyer in Washington, whereby they mutually agreed to undertake the recovery of the property for the heirs, and to divide between them the net proceeds of such percentage as the heirs might agree to pay.   Thereupon De Chambrun set out to find the heirs, who were residents of France,—a result which he accomplished with the assistance of one Stanislaus Le Bourgeois,—and on April 20, 1876, he entered into a written contract with them.   By its terms he undertook and agreed to commence and carry on proceedings for the recovery of the estate, and to bear the expenses thereof.   The heirs agreed to pay him as compensation for his services and outlay a sum equal to $47\frac{1}{2}$ per cent. of any money or property recovered in such proceedings, and as security for such payment gave him a lien upon such recovery.   They also executed a power of attorney, giving him full authority to act for them, retain counsel, prosecute suits, negotiate, and compromise, but at his own risk and expense. At a subsequent stage of the proceedings further documents authorizing compromises, etc., seem to have been executed by the heirs, but they are immaterial here, and need not be referred to.   De Chambrun thus became the attorney in fact of the heirs in the prosecution of their claim, and from this time on during the long, arduous, and complicated proceedings in and out of court, with the narrative of which the voluminous record in this case is filled, he is the central and dominant figure.   Briefly stated, the history of the litigation is as follows:

In September, 1876, an action was brought in the United States circuit court for the Southern district of New York, in which E. Delafield Smith appeared as solicitor and John A. Stoutenburgh as counsel.   An amended bill was filed early in 1877, but after answers and replication the suit was discontinued, May 27, 1878.   On the same day a second suit was begun in the same court, with Stoutenburgh as solicitor, and was prosecuted through its various stages until April, 1883.   Its character and magnitude is described in a letter, put in evidence by complainant, from one of the counsel engaged in its prosecution, as follows:

"After [the death of E. Delafield Smith, in April, 1878] the whole burden of the work fell upon De Chambrun and his new associates. The enormous work performed by them can hardly be explained or understood without a personal examination of the papers. Personal searches were made through the records of a number of countries, running back for three-quarters of a century. Numberless old persons were hunted up and interrogated. All kinds of threads were followed up; in most cases with the result of discovering that they ran nowhere. Six years were consumed in this labor. Meantime the taking of testimony began, and continued over three years. Of that it is enough to say that the record makes four large printed volumes. That the work was thus carried on was due to the indomitable energy and pluck of De Chambrun. That anything has been realized is due to him and his associates, whom he inspired with his own spirit."

This description seems to be reasonably accurate. The stake for the winning of which all these exertions were put forth was originally believed by all parties to be worth millions, but depreciation in the value of real estate and other vicissitudes most materially reduced its amount. In June, 1880, William I. Chase, one of the defendants, compromised by conveying to the French heirs an undivided one-sixth in part of the property claimed by them, and thereafter began an action in partition to distribute the same. In July, 1881, Nelson Chase, another defendant, compromised by the conveyance of a further one-sixth in the same property, and on April 4, 1883, Mrs. Caryl, the remaining defendant, made a like compromise. The property, after partition, realized finally about $350,000, and the 47½ per cent., when distributed, amounted (by reason of accretions during the proceedings to adjust all claims) to $178,784.33. Defendant's employment in this litigation began in the summer of 1876. From that time till its close he was constantly engaged in the performance of the work that was allotted to him, and to that work he devoted practically his entire time. He examined records in public offices and elsewhere, sought diligently for testimony, was present at every argument and on every hearing, marshaled the witnesses, examined the law points as they arose in consultation with counsel, assisted in preparation of the pleadings to the extent at least of furnishing to counsel the data he had obtained, prepared digests of the proofs and memoranda for guidance of counsel in the examination of witnesses, kept track of all appointments and registers of all that was done, under authority of the solicitor signed the solicitor's name to such formal papers as the conduct of a suit requires, attended to the printing, and generally performed all the work which, when a suit is conducted by a well-equipped law office, is done by the clerks therein. With De Chambrun he was in constant communication. They consulted together daily when De Chambrun was in town, and Schermerhorn wrote him almost daily when he was absent, whereby complainant was kept fully advised of every step taken, and of all occurrences having any bearing on the business in hand. Defendant was competent, careful, untiring, accurate, painstaking, and it is manifest that the litigation was of such magnitude that the man who was willing to do all this—and to do it thoroughly and well—would find that he was practically making it the business of his life for the time being. Apparently he never examined a witness, nor participated in an argument, nor assumed to conduct the case, in the sense in which those words are used when describing the duties of solicitor and counsel. In the two suits together there were at one time or another employed as counsel Joseph B. Stewart, E. Delafield Smith, Levi S. Chatfield, Gideon J. Tucker, John A. Stoutenburgh, Matthew H. Carpenter, Douglass Campbell, and Roscoe Conkling. Some of these have left in the case no record but their names, and the burden of the litigation seems to have been borne first by Carpenter, afterwards by Campbell, and to some extent by Stoutenburgh. But with whomsoever might for the time being be the counsel in charge Schermerhorn constantly consulted. He also

took an active part in negotiations outside of the litigation for sales of the property partitioned.

Whatever may have been De Chambrun's financial resources, they were evidently wholly inadequate for initiating and carrying on any such litigation as this. From its very inception, therefore, he paid in promises, which, whether expressed upon their face to be contingent or not, were of no pecuniary value unless the litigation should prove successful, and the 47½ per cent. become available for their payment. Partly because it was supposed that the property was very valuable, and partly because counsel of ability are unwilling to hazard the loss of time and labor, which might be given elsewhere for a fair cash remuneration, without some additional prospect of reward to cover the risk, these contingent promises were out of all proportion to the value of the services to be rendered. And, possibly because De Chambrun was, as the circuit court expressed it, impulsive, generous, and optimistic, possibly also because he was shrewd enough to know that the surest way to "inspire his associates with his own spirit," and stimulate them to devote themselves despite difficulties and discouragement and delays to the end in view, was to awaken their avarice, the disproportion in this case was enormous. Twenty-five thousand, thirty thousand, forty-five thousand dollars—4 per cent., 7 per cent., one-tenth, one-sixth, in some instances one-fourth of a sum supposed to be within the millions suggested potentialities of speculation calculated to insure active and persistent exertions. The record in the case at bar, with its narrative of the transactions between complainant, defendant, and Campbell which followed the first compromise, when the end was in sight, and the spoils of a victory, less profitable than was hoped for, remained to be divided, is a pitiful exhibition of the baleful influence of such speculations upon the profession of the law. Suspicions, too often well-founded, of each other's intentions, efforts at combinations in which the individual combiners should "pool" their claims and unite to protect their interests against all other claimants,—efforts which proved abortive, because some one of the combiners was always sure to feel he was not getting his full share,—bitter recriminations, smooth words to patch up a hollow truce under cover of which new schemes to ward off other claimants might be arranged, broken promises, shifty devices, secret agreements, make up a history which we are fortunately spared the task of further reviewing.

As before stated, defendant was first employed some time in the summer of 1876. On October 25, 1876, De Chambrun signed and delivered to him a written agreement, in which, "for services performed and to be performed during the next ninety days in the suit of Jumel et al. vs. Chase [the first suit supra]," he agreed to compensate him (1) by paying him $500 within 90 days, (2) by paying him, his heirs or assigns, the further sum of $10,000, when the title of the heirs should be established, either by suit or compromise. And to secure such payment he pledged his share under the contract with the Jumels. Why De Chambrun should have thus agreed to pay defendant $3,500 a month for three months of such service

as he could render we do not know, and this record does not tell us. It may be that he supposed the information as to the Jumel estate which Schermerhorn had acquired when in Edmonds & Field's office was valuable, and that it was better to buy it with him at a high price than to spend less money and more time in obtaining it through some one else. It may be that his two or three months' acquaintance with Schermerhorn had satisfied him that defendant was just the man he wanted, and that he wanted his whole time, and a devotion to the business in hand, which only some startling promise of reward would secure. It may be that he did not give the amount of compensation much thought; that he was merely improvident and reckless with his promises, where the ultimate recovery would be so large that $10,000 would be a trifling item. Why he promised this sum we do not know, but we do know that it was promised for legal services; was promised absolutely if such services were rendered and success obtained; that the bill concedes this, although it avers that the period of 90 days was not the real limit of the services; and that no claim is made that this contract is impressed with any resulting trust in favor of complainant. The $500 stipulated for was paid in due course; the $10,000 was also paid at the foot of a judgment in Chester v. Jumel. That suit was brought in 1886, by the assignee of Stoutenburgh, to obtain the latter's agreed compensation out of the fund resulting from sale in partition. All persons having claims thereon, including Schermerhorn and De Chambrun, were made parties, and the decision therein settled priorities and awarded the respective amounts.

The 90 days named in the agreement of 1876 expired on January 25, 1877. Subsequent to that date, and prior to August 28, 1880, when a further agreement to pay Schermerhorn $30,000 (hereafter to be considered) was signed, De Chambrun paid him from time to time, in various small amounts, $3,175, and subsequent to August 28, 1880, he paid him in like manner $2,100. These sums, aggregating $5,275, the bill avers were to be considered as advances subject to final adjustment and were to be credited to complainant upon final accounting as part of the compensation stipulated for in the written contracts. There is conclusive evidence to the contrary of these averments. In the Chester suit the question as to these cash payments was presented and litigated vigorously between the parties to the suit at bar. Schermerhorn was cross-examined thereon at length, and the referee found that these payments were for services not covered by either written agreement, and were not intended to apply, nor were they applicable, on any indebtedness created by such contracts. These findings were incorporated in the judgment entered in Chester v. Jumel, and as between the parties here, who have thus once litigated the questions covered by them before a competent tribunal, are conclusive evidence of the facts they set forth. As was shown before, the Jumel litigation continued long subsequent to the 90 days mentioned in the contract of 1876,—long after the suit, which was pending when that promise was made, had been discontinued. The counsel who had been prominent at its inception gradually disappeared. Stewart "went South," Smith was

stricken with paralysis and died in 1878, Carpenter died, and in September, 1880, Campbell was employed, apparently to take his place. Through all these vicissitudes Schermerhorn remained active, diligent, seemingly the one man who thoroughly knew the history of the case from its inception in the first suit; knew where the evidence was to be found, which witnesses were living and which were dead; knew where to find each document or memorandum or reference to authority in the intricate mass of papers which such a litigation heaps up, wheat and chaff together, in the office of its solicitors; knew from frequent consultations with the earlier group of counsel just what were their opinions and plans, adopted or abandoned, as to the conduct of the case,—a most desirable associate, undoubtedly, for new counsel about to take up an unfamiliar litigation. Whatever may have been the value of Schermerhorn as a coadjutor when De Chambrun first met him in 1876, he was undoubtedly worth far more in 1880, when the W. I. Chase compromise gave promise of ultimate success, and time had become an important consideration to persons wearied by four years of delay.

On August 28, 1880,—two months after W. I. Chase's compromise,—De Chambrun and Schermerhorn executed the paper which is the subject of this action. It reads as follows:

"It is hereby stipulated and agreed by and between Charles Adolphe De Chambrun, as attorney in fact of the heirs at law and next of kin of Stephen Jumel, late of the city of New York, and George J. Schermerhorn, attorney at law, at the city of New York, that in consideration of the services rendered by said Schermerhorn at the request of said Chambrun, and in behalf of said heirs at law and next of kin of said Stephen Jumel, in litigations involving the title to premises in the city of New York at one time owned by said Stephen Jumel, said Chambrun agrees to pay said Schermerhorn the sum of thirty thousand dollars ($30,000), and such sum of $30,000 is hereby made a lien upon any moneys or property which said Chambrun may receive for said heirs at law and next of kin as aforesaid. It is further agreed that this agreement shall bind the heirs, executors, administrators, successors, and assigns of the respective parties hereto. In witness whereof the above-named parties have hereunto set their names and seals at the city of New York this 28th day of August, 1880.

"Charles Adolphe De Chambrun. [L. S.]
"George J. Schermerhorn. [L. S.]
"In the presence of Walter R. Beach."

The bill charges that:

"At the same time said contract was so executed it was understood and agreed between the said De Chambrun and defendant that the defendant should hold said contract, and should receive and hold any money or property which he might receive and hold under it, in trust for said De Chambrun; and that after his own services, mentioned in Exhibit A [the agreement of October, 1876], and hereinbefore alleged, should be paid for, he should transfer and pay over to said De Chambrun all such property and moneys."

The bill prays that it be adjudged defendant holds said assignment and contract and all moneys which he has received thereunder in trust for De Chambrun, and asks for an accounting and payment. Defendant received the full amount of this contract of August 28, 1880, under the judgment in Chester v. Jumel.

The reason why this alleged secret trust was created is set out in the bill as follows:

"That during the year 1876 said Charles A. De Chambrun, from time to time, made contracts with parties other than defendant, whereby other liens and charges upon his share of the estate aforesaid were created, and certain other liens and charges upon the same were claimed to have been created and to have become charged upon said De Chambrun's said share, whereas in truth and in fact such alleged liens and charges were such as could not in equity be held to be valid. And thereupon it became and was for the interest of De Chambrun that some portion of said share should, in so far as it properly could, be set aside and cleared ""om such alleged liens or charges, and so reserved that in any event, and       .natever the amount of the recovery in said litigation, a certain sum, being part thereof, should belong to him, and, to secure this end, that the legal title thereto should be vested in some one other than him, the said De Chambrun. And it became and was also desirable for both him and defendant that any additional compensation which might become due to the defendant under the agreement set forth in the fifth paragraph of this bill should be secured to be paid out of said De Chambrun's said share of the estate, free and clear of other liens except such as had already attached thereto."

The answer specifically denies all allegations that the contract is impressed with any such trust, or is other than what it appears to be on its face,—an agreement to pay a specified sum for legal services rendered. The promise to pay is not contingent on success, but we do not think that fact material. The evidence shows pretty conclusively that De Chambrun's personal obligation for $30,000 would have been of no particular value had the litigation proved barren, and the W. I. Chase compromise had made success reasonably certain. There is nothing on the face of this contract to indicate the existence of a trust, and the party who seeks thus to vary the written instrument assumes the burden of proving his claim by a fair preponderance of proof. As the trial goes on, the weight of evidence may shift from scale to scale, but the burden assumed at the beginning must be sustained at the end of the case. We find in the record no direct proof of an agreement that the contract should be held in trust, and it is suggestive that throughout the voluminous correspondence of the parties there is no allusion to its existence. Some of the subsequent actions of complainant himself seem wholly irreconcilable with any such theory as that now advanced on his behalf. His counsel suggests that there is a sufficient explanation of his attempt in the Chester suit to have all the contracts (including Schermerhorn's) thrown out, as not constituting liens on the fund, and all disallowed, because of champerty in the original contract; since, in that event, all being forced to accept a quantum meruit, De Chambrun would receive personally quite as much as he would under the alleged trust. But such explanation does not cover his attempt to secure the rejection of Schermerhorn's contract, for the reason, peculiar to itself, that "if he [Schermerhorn] had a lien,   *   *   *   he waived such lien by having had under his control sufficient of said property to satisfy his lien, and having parted with the same without having asserted his lien thereto"; nor does it explain why he endeavored to have the cash payments of $5,275 charged against Schermerhorn's contracts. If De Chambrun's objections to the contracts generally proved sound, this peculiar objection to Schermerhorn's would be superfluous. If, however, the general objections proved unsound, then by his

special objection complainant ran the risk of destroying the very ark of safety, which, as he now alleges, he himself constructed for the express purpose of securing $30,000 for his own share, "reserved and cleared from all liens or charges." Upon the whole case, giving due weight to all the circumstances near to or remote from the date of the transaction, we do not find evidence adequate to prove the trust alleged. It would be proper to give the time necessary to discuss at length the circumstances relied on by complainant in support of his contention, were it not that there is inherent in his case an equitable bar to sustaining that contention, even if the proof of such a secret agreement as is alleged were clear and convincing.

The contracts made "during the year 1876" referred to in the complaint were these:

Contract No. 1: On March 3, 1876, with E. Delafield Smith, whereby, in consideration of $16,250, advanced by the latter for the purpose of negotiating and perfecting the purchase from the French heirs, De Chambrun assigned to him one-fourth of his interest in any contracts he should have or thereafter make with the French heirs. This contract was superseded by a subsequent agreement of the parties to it on January 5, 1877, which agreement is treated in the case at bar as among the "agreements made in 1876."

Contract No. 2: On March 3, 1876, with E. Delafield Smith. It recited the purchase by Smith of a one-fourth interest in De Chambrun's contracts with the French heirs; and that Nelson Chase, a tenant upon and claimant of part of said Jumel estate, was indebted to Smith in the amount of about $25,000. Thereupon the parties further agreed that "the said sum of $25,000 or thereabouts shall also be paid to the said Smith out of the proceeds of said Jumel estate so acquired by the said heirs, or any further interest therein, after the payment of all proper disbursements, and is hereby made a charge on the same." The superseding agreement of January 5, 1877, above referred to, expressly mentioned this contract, and continues it in force.

Contract No. 3: On March 4, 1876, with Joseph B. Stewart, providing that in the contract already made with the French heirs, or in any agreement that may be made by De Chambrun with them, "the same, and every part thereof, after paying and discharging all expenses and charges, and the paying of all associate counsel fees, and for the use and advance of capital, shall be equally shared and divided by and between said De Chambrun and the said Stewart." Stewart, it will be remembered, was the one who, early in the summer of 1875, first called De Chambrun's attention to the fact that there was property formerly of Stephen Jumel to which his heirs in France were probably entitled, and who sought to interest him in the matter.

Contract No. 4: On July 10, 1876, with Stanislaus Le Bourgeois, transferring to him $7\frac{1}{2}$ per cent. out of his $47\frac{1}{2}$ per cent. in consideration of his services in discovering heirs of Stephen Jumel who were unknown to De Chambrun, and in settling with them the basis of the contract of April 20, 1876.

Contract No. 5: On August 8, 1876, with John A. Stoutenburgh, agreeing to pay him 4 per cent. on the entire proceeds of the property, covenanting that it should be a specific lien on the property recovered. Consideration, professional services.

Contract No. 6: On October 4, 1876, with Levi S. Chatfield, agreeing to pay him $1,000 within a few days, and further to pay him, his heirs, or assigns, $45,000 when the title to the property should be established, and, if less than the whole should be recovered, or the rights of the heirs compromised for less than the whole amount, then to pay a pro rata share of the amount recovered. To these payments De Chambrun pledged his share and interest under the French contract. The consideration expressed is "for services performed and to be performed, and information communicated in relation to the interests of the legal heirs," etc. Chatfield, like Stewart, was aware of the existence of the claim before De Chambrun heard of it. He seems to have been one of the counsel in the earlier Jumel litigations. In Chester v. Jumel it was held that he performed the services and communicated the information, and no one here questions such finding.

Contract No. 7: On October 5, 1876, with Gideon J. Tucker, in which, for services performed and to be performed, and information communicated, he agreed to pay $10,000, and 1½ per cent. of all that might be recovered by suit or compromise.

Contract No. 8: On October 25, 1876, with Schermerhorn, already set forth supra.

Contract No. 9: On October 26, 1876, with Griswold and Chamberlain, assigning 5 per cent. of the 47½ per cent. for a cash advance of $6,600.

Contract No. 10: On November 9, 1876, with Jesse C. Connor, assigning him 3⅓ per cent. of 40 per cent. of the entire recovery for services to be rendered in relation to the prosecution and preparation of the case of the French heirs against Nelson Chase and others.

Contract No. 11: On January 5, 1877, with Smith, superseding contract No. 1, and agreeing that he should receive out of the proceeds his advance of $16,250, and one-tenth in value of the recovery in the Jumel proceedings.

These are the contracts as to which the bill alleges that it "was for the interest of De Chambrun that some portion of his share [the 47½ per cent.] should be set aside and cleared from their lien and charge," and "so reserved that in any event, and whatever the amount of the recovery in the Jumel litigation, a certain sum of money, being a part thereof, should belong to him," irrespective of the fact whether he had or had not already assigned or promised it to some one else. It was "for this purpose, and not otherwise," as the bill avers, that the written agreement with Schermerhorn was executed. Its avowed object, on complainant's own showing, was to create a bogus claim against the fund, ostensibly for legal services,—a claim which, as Schermerhorn had undoubtedly rendered legal services, would no doubt be paid as a legitimate, although extravagant, charge, and which, when thus paid, was to be secretly reserved for De Chambrun, out of the reach of any others who

might hold his promises to pay from his share of the proceeds of the litigation. Complainant cannot take the first step towards recovery under this bill without proving that the contract of August 28, 1880, was a sham, and when he has proved that (we are of opinion that he has not succeeded in doing so, but assuming that he has), then the undisputed facts in the case stamp it as a fraudulent sham. Such a sham agreement would be a fraud on Stewart. It was indeed held in the Chester suit that his contract gave him no specific lien upon the property or money in the hands of the trustee, Elliot, who held the proceeds of the compromise; but there is nothing before us to show that his contract with De Chambrun was not a valid and subsisting obligation. As he was the one who gave De Chambrun the information without which he would never have sought the heirs nor undertaken the prosecution of their claim, Stewart's contract was certainly based upon sufficient consideration. If, "after paying and discharging all expenses and charges, and paying all associate counsel fees," there should be $30,000 left for De Chambrun, Stewart would have been entitled to one-half the residue. If the creation of a sham claim of $30,000—for further counsel fees—exhausted the fund, there would apparently be nothing for De Chambrun, and therefore nothing for Stewart, while in reality De Chambrun, secure in his secret trust, would quietly pocket the whole $30,000, and leave his original partner in the adventure in the lurch. If the agreement of August, 1880, were a sham, it was a fraud on Smith, or rather on his administratrix. His contract No. 2 was construed by this court in De Chambrun v. Campbell's Adm'rs, 54 Fed. 231. We there held that Smith was entitled to payment of $25,000, the amount of the Chase notes, only "after payment of all proper disbursements" by De Chambrun. To create a bogus claim for legal services,—apparently a proper disbursement,—and thus deplete the fund from which the $25,000 stipulated for by Smith was to come, was a deliberate fraud upon his administratrix, and none the less a fraud because subsequently, and before the money was distributed, this contract No. 2 had passed by assignment to Campbell for De Chambrun's benefit. The agreement of 1880 is to be judged in the light of the situation at the time it was made; its inherent vice is not purged away by subsequent accidents. The agreement of August, 1880, if sham, was ripe with the potentiality of future fraud. On August 31, 1881, De Chambrun, in consideration of $10,000 cash, advanced to him by Mrs. Frances A. Gesner on his note for that amount, assigned to her as security all right, title, and interest in all fees and money due or to become due to him for services or compensation in Jumel v. Chase, or under any settlement thereof, with a covenant, which, in view of the facts above set forth, is, to say the least, remarkable, that he had "not heretofore made or executed any assignment of the interest in the fees or compensation or the money due to me in said action, or under any settlement with any of the defendants therein to any person whomsoever, nor any part or portion of the same." Manifestly what was to come to De Chambrun as due for his services and compensation was only what was left after the claims of others for proper legal services were

paid. If the August agreement was really for such fees, it would take precedence of Mrs. Gesner, and she would not be entitled to any portion of the money paid under it. If it were what the complainant contends,—an arrangement whereby De Chambrun was to pay to De Chambrun,—Mrs. Gesner's claim would be entitled to precedence, or to payment out of its proceeds. Now, Mrs. Gesner was a claimant in the Chester suit. Her contract came next after Schermerhorn's August agreement, and the various claims allowed were given priority in their chronological order. Schermerhorn's was presented as what it appeared to be, an agreement to pay for legal services rendered. De Chambrun was present in person and by counsel, but gave no hint that it was the sham he now claims it was. In consequence, the referee allowed it, and its $30,000, added to earlier claims, so depleted the fund that for Mrs. Gesner there was left but $601.36 for her genuine and righteous claim for $10,000 and 10 years' interest.

The theory, then, of complainant's claim is that, having deliberately concocted with defendant a scheme whereby some of his creditors might be defrauded, the result of the scheme has been that his co-conspirator has obtained the money which complainant expected to secure, and now refuses to divide or pay over. The attitude of a court of equity towards litigants thus situated is too familiar to require citations from the reports. It is tersely and forcibly set forth by Mr. Justice Lamar, delivering the opinion of the court, in Dent v. Ferguson, 132 U. S. 50, 10 Sup. Ct. 13: "That court is not a divider of the inheritance of iniquity between * * * two confederates in fraud." While conceding this rule, however, complainant's counsel contend, and the circuit court reached the conclusion, that the case at bar falls within the well-recognized exception that "as against an attorney and counselor the law will set aside an agreement made with his client by which property is placed in his hands to keep it out of the reach of the creditors of the client." The cases cited as sustaining and defining this exception are Ford v. Harrington, 16 N. Y. 285; Fisher v. Bishop, 108 N. Y. 25, 15 N. E. 331; Place v. Hayward, 117 N. Y. 487, 23 N. E. 25; In re Howell, 10 Law T. Rep. 367. When these cases are analyzed, however, it is apparent that they do not support the proposition that the wholesome rule which refuses the aid of a court of equity to one of two fraudulent parties as against the other is to be done away with when both stand in pari delicto, merely because the defendant is a lawyer, nor to make the path easy for lawyers to escape the application of the rule by choosing their law clerks as assignees. In each of the cases cited it will be found that "the parties, although in delicto, did not stand in pari delicto." "It would be a reproach to our judicial tribunals should they allow their officers * * * thus to acquire property by a prostitution of the trust so confided to them, and then to interpose the fraud committed by their advice as such officers as a shield to protect them in such possession and enjoyment of that property." Ford v. Harrington, supra. In that case it appeared not only that the member of the bar was the assignor's attorney and counsel, but that it was in accordance with

and pursuant to his advice as such counsel that the contract was assigned by Conway, who "was a mere instrument in the hands of the defendant." And that fact is expressly stated to be the reason why the rule which refuses relief between partners in fraud was not applied. The facts in Fisher v. Bishop, 108 N. Y. 25, 15 N. E. 331, present so different a case from the one at bar that they need not be discussed at length. In Place v. Hayward, 117 N. Y. 487, 23 N. E. 25, the scheme to defraud creditors "was concocted and carried out under the advice of the defendant," who was the instigator of the fraud, the plaintiff relying implicitly on his advice; hence the court held the parties were not in pari delicto. In the case at bar, however, there is no pretense that De Chambrun was induced to make the transfer by the suggestion or advice of Schermerhorn. The very bill uses language which indicates pretty plainly what must have been the fact, if the contract be, as complainant insists, a sham one. "It became and was for the interest of De Chambrun that some portion," etc., "should be set aside," etc., "and, to secure this end, that the legal title should be vested in some one," etc.; that "for [these] purposes said De Chambrun and defendant entered into and executed a certain contract," etc. There is not a scintilla of evidence to show that Schermerhorn beguiled a confiding client into committing the fraud, or that it was in reliance upon his advice and in accordance with his suggestions that it was consummated. A review of all the evidence in the case satisfies us that in all these transactions De Chambrun's was the dominant mind. Of the threads of all his intricate contracts and combinations he kept the control, and to a large extent the secrets, too, for as late as 1886, in reply to Schermerhorn's expressed surprise at hearing then for the first time of the Le Bourgeois assignment, De Chambrun writes, "When you have accepted my terms, and joined me absolutely and unreservedly, then you shall know everything." In everything—certainly in everything outside of the actual suit in equity, where he may be regarded as a junior associate counsel—Schermerhorn was but a clerk, the mere hand of his employer, following his instructions and carrying out his wishes, until the time when, some years subsequent to August, 1880, he declined to join in an effort suggested by De Chambrun to set the old Wilson contract on its feet by the aid of a colorable assignment, and thus use it to defeat all subsequent contracts, including his own. We see no reason for extending the exception to the rule that one particeps doli shall not have the aid of a court of equity against the other to cover cases where the original designer of the fraud has chosen its own clerk as the instrument to carry it out, simply because that clerk is a member of the bar, where there is nothing to show that he suggested or advised the fraud. As complainant, therefore, could not obtain the relief prayed for even if the contract of 1880 to pay $30,000 for legal services was in fact a bogus one, it is unnecessary to discuss at length the arguments which he advances to show that it is. It is enough to say that in our opinion he has not proved that it is.

The decree is reversed, and cause remitted to the circuit court, with instructions to dismiss the bill.